Good morning. James Thompson on behalf of Appellant Jerome Lewis. In this case, a reasonable officer would not have detained Mr. Lewis for the traffic violation or violations absent a desire to investigate a more serious and unrelated criminal offense. Why do you say that? Well, the facts are such that there were four gang task officers whose duty that night was to go out into the gang areas or the crime areas in San Francisco and look for, they were a specialized unit of African American gangs, and look for gang activity and specifically to look for guns involving gangs. As they were driving through the Haight Street area, not a high crime area where they were located, they noticed Mr. Lewis and his passenger, Mr. Alamu, both African American, had started to park their car on a corner. As they parked their car, part of it, and I think the record is pretty clear, very little went into the crosswalk of the car. The officers then, instead of pursuing and going off to their own assignment, made a U-turn, came back around, parked behind Mr. Lewis's car, got out of the car, and went to that vehicle. By the time they made the U-turn, came back to the vehicle and parked, Mr. Lewis and his passenger, Mr. Alamu, had gone into the corner store to purchase some items. The keys of the car had been given by Mr. Lewis to his passenger, so he didn't have possession of the keys. The officers then pulled in behind the car, made a radio call to find out the status of the registration of the car. It got a determination from the dispatch officer that the car was not registered and had not been registered since 2007. The officers, however, noticed that there was a temporary registration tag properly affixed to the rear window of the car, which trumped any kind of dispatch call that would have said that it was unregistered. But they also, didn't they have experience that these temporary registrations are often counterfeited? I think that that's the argument that the government made. I'm just asking if that's in the record. I think that the officers may be able to say that they have on occasion had counterfeit tags, but this tag was not. And they did nothing to verify whether or not the tag was proper. They ignored the temporary registration tag. They went off of the information that they got from dispatch and then went into the corner store to detain Mr. Lewis. Counsel, even if what you say is correct, that they were interested in other things as well as the parking violation, how much does their subjective interest count when there is an objective violation going on? Well, the objective violation with respect to the parking ticket, they should have ticketed the call, the car, pursuant to both San Francisco Police Department policy and the California Vehicle Code. They could have written a car for being an illegal parking job. Had they looked and verified that the registration was valid, the temporary registration was valid, that's all they would have done. They would have ticketed the car and drove on, gone back to their business of looking for gang activity and looking for guns. But, Counsel, with respect, I – what I'm understanding you to say is you admit that there was a violation of the Vehicle Code because they parked in the crosswalk. He admits a little bit. We've all had a ticket for not coming to a complete stop, haven't we? Yes. The reality is there was a violation of the Vehicle Code. Officers are entitled to do that if they want to. Now, you can say, well, why would they do it? They've got all these other things they can do. But the reality is they had a lawful basis for stopping. When they called in on the license plate, that seemed to confirm a problem. Now, you've offered some explanatory information about the temporary tag, and that may or may not be true. But the reality is they still had this crosswalk situation. So when you look at the totality of the circumstances, I'm having a little difficulty, if this is the primary thrust of your argument, to see how you're going to get anywhere with this. I get some of your other arguments, but this one I don't quite understand. You may not have done that. Other officers may not have done that. But these officers had the right to do what they did, didn't they? Well, I don't think that they did. I think that once they recognized that there was a parking violation, they had under the duty of the vehicle code to write a ticket and move on. They either have a mistake of fact or a mistake of law by ignoring the temporary registration tag. I mean, that's the purpose of why we get them. I mean, this person, Mr. Lewis, did what he was supposed to. He got a temporary registration tag. That should be assumed to be valid. That should mean that the car is registered. They did not call dispatch back and say, by the way, we have a temporary registration tag in the rear window. Does that affect your analysis of whether the car is properly registered or not? They didn't do that. But is there anything wrong, you know, with them asking? They basically ask them for their license, right? They ask him for his license when they go into the little side grocery store, right? Yes, after they have found out that the car, in their mind, is not properly registered. They couldn't ask him for that for the traffic violation. The parking violation, they had no basis to go and talk to him at all. I mean, they could always talk to any citizen. Well, that's what I'm saying. I mean, that's what the odd thing is. Intuitively, we all think that nobody can stop us and say, can I see your license? And we think, oh, that's terrible. But, in fact, the police have that right, and I can say no and walk on with no consequence. But is there any legal reason they couldn't ask that? When it comes down to them finally searching the vehicle, there is. Because the inventory search ---- But before that, go into the little corner store and say, can I see your license, Mr. Lewis? Here it is. But that is ---- Was that legally flawed is what I'm asking. I think the detention was illegally flawed because ---- Was that a detention to ask that? Because they detained him and asked him based upon the fact that the car was not registered. But he wasn't detained. He was detained at that moment. Because they asked him? When they asked him for his license, he was detained. He couldn't move. He had to provide what evidence he could. He gave them a suspended license. Immediately upon getting the suspended license ---- Well, I would probably disagree with you from a legal standpoint, given our case law, that he's detained. But let's just ---- So they asked for the license. Now he has a suspended license, right?  They search the vehicle, and they find him. They search the vehicle. Immediately two officers stay with Mr. Lewis, two other officers go over and search the vehicle. They go and they pull up the rear seat of the car. Well, they're allowed to search the whole vehicle once they find he has a suspended license, aren't they? Everywhere. Glove compartment, under the seats, everywhere. But only as an inventory search. They did not have the ability to search the car incident to arrest because they did not arrest Mr. Lewis. They only detained him. So they only have the purpose of doing an inventory search, which is limited to caretaking purposes, not doing a search that is akin to the search that was done in the movie French Connection, which is taking apart the entire car. Where did they find the gun? Underneath the rear seat, wrapped in a T-shirt. But don't they, if you're doing an inventory, my understanding of your argument was, I mean, you would look there, but that they quit looking so that in your view it wasn't really, it was a pretext inventory search. I thought that was your argument. Well, it is a pretext inventory search, but I don't think that an inventory search necessarily allows them to go through underneath the rear seats. I thought an inventory search allowed them to search the entire car. It does allow them to search the entire car for caretaking purposes. It wasn't until, you know, whatever cases came about in which they allowed them to take and search bags that were inside a car on an inventory search because there might be some danger associated with the bag, so that the officers, instead of just putting on the inventory one bag, could actually look inside what was in the bag. But it doesn't allow them to dismantle the car because it's for caretaking purposes. To what degree did they dismantle the car? They lifted up the rear seat. It's not, they didn't look underneath like the front seat, you know, the driver's seat. The rear seat has got a, you know, a bar down at the bottom. You can't reach underneath it. They had to pull the seat up. So it's not an inventory search. An inventory search would be open up the trunk. What's inside the trunk? A bag. Open up the bag. What's inside the bag? And if there had been a gun in that bag, that would be it. An inventory search is, you know, I had $5,000 in a little briefcase and I stuck it under my seat. You guys towed my car. Where is my $5,000? So an inventory search is that you can look at anywhere that you might, there might be stuff so that they make sure that the inventory matches with the car. So if the person comes back, they don't say, hey, I had $5,000, which is not illegal to carry that around. And I stick it in a little briefcase. I stuck it under the seat. So why would it be illegal? Because that's precisely what they're supposed to do is make sure there's not, you know, they want to categorize everything in there. Yes. So that the citizen can't come back later and say, you know, you took my, they usually don't say you took my gun, but they took my money, you took my this, you took my that. But you can't dismantle the car. I mean, you can't pull off the, you know, the door jams. You can't take off the fabric on the doors to look inside the doors. You can't pull the dash out to see what's happening. None of that happened here, did it? No. They lifted the seat, though. Okay. But counsel, with respect, you've indicated that there was a metal bar down there. So they really couldn't tell anything was under the seat. It's not dismantling the car, is it, to simply lift the seat up and take a look? That's not a big deal, is it? I think it is because you have to remove the, you know, the leaning portion, the back portion, and you have to lift the seat out. You can do that just like that. It's real easy. But, again, it's not part of an inventory search, is it? Well, I think that's really the question, is that McEwen pointed out what they want to do is to avoid claims that somebody says, I left $5,000 or $10,000 or a bunch of bag of diamonds or whatever in the car, and you took it, and it's gone. They want to be sure that there's an inventory. That's – I guess I have a little trouble understanding how lifting up the seat in the fashion that was done here is some kind of a rape and pillage of the car. It was just a pretty straightforward opening up, see if there's anything under the seat. And isn't the language of the San Francisco general order controlling this? Officers may search anywhere inside the vehicle, including consoles, glove boxes, under the seats, inside the trunk, and inside any container in the vehicle. And that's the argument we make, that that policy is unconstitutional because it allows the officers far too much discretion. They're allowed to search anywhere, anytime, anything. And that kind of policy that trumps the Fourth Amendment by not having their probable cause or a reasonable cause to look in a particular area is unconstitutional. They can't be allowed to just search everything. They can't be allowed to do the French Connection search every time the car comes into inventory. And there was no evidence presented at the hearing that this is the type of inventory search that is routinely done. First the search was done at the scene before Mr. Louis was arrested. Inventory searches are traditionally done at the inventory impound lot by an inventory officer, not a gang task force officer who is not looking for caretaking purposes, but instead is looking for elements or indicia of another far more serious crime. And that's why when they pulled up to the stop and they was in the crosswalk, they should have called traffic and said, you got a car here that's parked in the lot. We're off to the gang areas to do the job that we're doing. Well, they could have done that, but they didn't have to do that, did they? No. But once they did, they cannot ignore that valid registration tag and take it to the next level, which is to go into the store and talk to him. And ask him for information. Well, let me just be sure I understand this. Is this your best argument? Well, I think that all of them. I mean, it sounds like you've got everything hinged on this temporary registration concept. Is that correct? Well, I mean, I think that that's the first stage. That's the first stage in the activity. The fruit of the poisonous tree, that's the whole thing, right? No, the second argument that the officers conducted an inventory search of Mr. Lewis's car as a pretext for general criminal investigation is just as valid. But I only have one minute left. But you might want to save it. And I'd like to save it for rebuttal. It is in the briefs and the excerpts, and I do want to make one comment at least about the filing of the additional authorities by the government. I'll do that in rebuttal. Thank you. Good morning, Your Honors. May it please the Court, my name is Mary Jean Chan, and I represent the United States in this appeal. This Court should affirm the District Court's denial of Lewis's suppression motion because the Court was absolutely correct in finding that it was a valid inventory search. Once the officers found out that Lewis was driving with an invalid license, they were required by the Department's policy to both impound the car and conduct an inventory search. Counsel, can I just ask you one question? We got a 28-J letter from you just a few minutes ago. The case has been out for a number of months now. Any particular reason why we got that at the last minute? Yes, Your Honor. I apologize for that. I was actually on leave for a few months, and so I didn't, in preparing for this argument, I redid the research again and found out. And what is the case that you cited, by the way, Mike, our presiding judge was on that panel. What does that have to do with this case? Well, it simply, I think, was relevant authority because the government cited United States v. Bohe, which talks about pretext. And it simply. So it's limited to the pretext argument. The Cardi case really was a. An administrative search. It was an administrative search at a border with the TSA. Correct. We're talking about officers on the street here, and it seemed to me, that's why I had to look and make sure I had the right case, because I didn't, having been there, I didn't think it had anything to do with this case. Well, I tend to be a little bit cautious in my 28-J letters and make sure that the court has all the authority that could be pertinent to it. And since Bohe has some age on it, I wanted the court to know that it had been recently cited by itself in an affirmative way. I want to move to counsel's comment on pretext. Yes. So you've got a car. It's illegally parked. Usually they give you a ticket, and then you get that and you pay it, and that's the end of the story. So here you've got a race issue. You've got the fact that it's slightly over the crosswalk. Why isn't that the end of the story? They know, in fact, that the tag isn't fraudulent. I mean, they have no real reason to believe it's fraudulent. So why isn't it a pretext to follow them into the store and to see what's up? Well, first, the district court found that there was, quote, no evidence of pretext. So the court, district court, made a specific finding, and that's at Excerpts of Record 136. What do you think the factual basis for such a finding would be? Well, I think that, first of all, Officer Jackson said that he didn't know who Lewis was, that race absolutely was not a factor in this in terms of him targeting Lewis. Well, I wouldn't expect him to say it was. So, I mean, you have this odd thing where, you know, they're the gang patrol, so they're out kind of cruising the streets here in San Francisco. And I'm just wondering, I mean, the pretext comes from kind of the amalgamation of circumstances that Mr. Thompson laid out. True. The finding is subject to a deferential standard of review, and the officer was asked these questions, so he has to answer them in a certain way. And I suppose the district court could have said, well, I don't believe him when he denies having a pretextual reason. But the – and I'd like to point the court to a photograph. It's Exhibit B from the evidentiary hearing. It's at the supplemental Excerpts of Record, page 63. When we talk about the car being parked in the crosswalk, it's not just a tiny infringement. It's actually significantly impedes the crosswalk. That interferes with pedestrians' safety and also their actual legal obligation to walk across the crosswalk when they cross the street. There's no evidence, as Mr. Thompson says, that this was a very safe neighborhood and that there – or anything about the neighborhood. But certainly we can infer that if it's a 930 at night, there might have been people walking around. The officers were reasonable in checking this out. There also – I want to take issue with the contention that there was evidence that the registration tag, the temporary tag that was affixed to the windshield, was valid. The record doesn't show any such thing. It was – and certainly there was no such finding. It was Lewis's contention that it was valid, but there was no evidence to that effect. In fact, if you look at Supplemental Excerpts of Record, page 48, it shows the temporary operating limit. And it specifically says that this permit must be supported by either a department receipt – department meaning DMV receipt – or a letter issued by the DMV. And so the officers, in fact, were in that situation faced with conflicting information from dispatch that it was a 2007 registration expired and a tag that says that something else would have actually been required to go up to Lewis and obtain some sort of support in order to take this at its face value. What was that, from the government's perspective, an invitation to inquire of Lewis, whether he had the additional documentation to determine whether the temporary tag was valid? It would have – it would have justified an inquiry of that effect. But I would like to agree with Judge McEwen's question earlier, which is that this wasn't a detention. An officer could go to a public space. I mean, Mr. – the defendant's witness was incoherent on many points, but he was very, very coherent about the fact that the liquor store was a public place. Anybody could go in there. And you have an officer going up to Lewis in a public place asking him for his license. He could have said, no, get away from me. And then we can talk about whether there were other factors amounting to a detention. But the fact is that the government's position is that even had there been a detention, it would have been justified because the law is very clear that when there's a violation such as, in this case, of both parking in a crosswalk and potentially at least reasonable suspicion to believe that the temporary tag or that the car was not validly registered, that the officers would have been entitled to conduct a stop and ask for the license and to do further inquiry. I mean, at every single step, these officers were not rash, but very considered in their judgment and in the actions that they took. So the officers were reasonable in the steps that they took in reaching the point at which they found out that there was an invalid license. This is not critical, but based on opposing counsel's point, I guess I want to find out if the officers had asked Mr. Lewis for the documentation that made the attempt on the temporary permit valid. Do they exist? Did he have them? Is there any way they could have satisfied themselves at that point and said, hey, well, it's all set? There's no evidence that there was any such documentation in the record. I don't believe that there was because subsequently when they completed the inventory search, they found a receipt in the car for fixing up the car, but nothing in the record refers to a DMV letter or anything along those lines. Did anybody ever check on it? Again, I'm not sure this is critical in it, but did anybody ever check whether there was, whether the temporary permit was in fact valid? I don't believe so. But I would like to remind the Court of the case United States v. Miguel, in which this Court stated that the officers were entitled to rely on the information from dispatch. Right. And also the fact is once they looked at the license and they saw that it was an invalid license, that was in some way superseded or made irrelevant to inquiry as to the registration. They cannot even issue the car to somebody with a valid, invalid license or can't return it to an invalid license, even if the registration is current. Well, let's move on then to the inventory search. Absolutely. Opposing counsel has argued that the search itself exceeded a normal inventory search. Do you want to respond to that? I do. I don't think it exceeded the search at all, the scope at all. First, I want to clarify or correct, I think, an error that was made. There's this notion that somehow the car was dismantled or that the seat was lifted up. And I, frankly, I couldn't find that in the record at all. The record indicates that the officers found the gun wrapped in a T-shirt under the rear driver's side seat. And that's that excerpt of Record 46. There's nothing in the record about lifting up the seat or dismantling it. But even if they had looked or moved things around in order to find the firearm, the policy specifically states, as did Rothstein read, that they're entitled to look in any place in the car. That's what the policy DGO 9.06 states. Were they supposed to call the supervisor first in terms of the total? No, Your Honor. Or enter the policy? The policy states that the mandatory section is 9.06 2A2, and it states mandatory circumstances. It is the policy of the Department that the officer shall tow any vehicle being driven by a person who has had his driver's license suspended or revoked. And that is different than the other sections that are under the larger section of 2A. Also, if you were doing an inventory search, don't you usually write down what you find? Yes, Your Honor. So the odd thing here is as soon as they find the gun, the inventory search kind of goes out the window. I mean, who knows if there was $5,000 in the glove box or elsewhere? Well, the officers did not do an inventory search. Yes, Your Honor. It was, first of all, it was objectively an inventory search. And the officers, well, we don't have any evidence in the form in the record of whether they filled out an inventory form. It's not in the record. But what we do have is the incident report in which the officers detail what they did and the fact that they found the firearm. Presumably they put down everything. And that's actually also required by the policy, which states that when you find a firearm, you are required to complete an incident report. And that's at Section 3B-2. That's at Supplemental Excerpt of Record 39. So Officer Jackson certainly complied with that. And to the extent that an inventory form, it would have been good practice to have an inventory form or that there was an inventory form, that should not impact Lewis' expectation of privacy because the scope of the search is what's at issue. The object of the search and the scope of the search were all authorized explicitly by the Toe policy. And also, the district court did not make any findings of bad faith with respect to Officer Jackson. In fact, she specifically, Judge Patel specifically said that she didn't find any pretext and that she credited all of the testimony that what he was doing was what was standard practice for the San Francisco Police Department. I'd like to also point the Court to the Supreme Court case Opperman at 428 U.S. at 375, where the Court specifically says that what is important about conforming to standard procedures, for example, the filling out of an inventory form, isn't that it's dispositive, but that it's a, quote, a factor tending to ensure that the intrusion would be limited in scope. And I would emphasize the word scope to the extent necessary to carry out the caretaking function. And the caretaking function here is clear. The policy itself states that the inventory is to guard against, is to locate and secure any valuable property to guard against false claims and to protect officers and others from dangerous objects. In this case, that's clearly what was at issue here. You have a car that's parked in the middle of a crosswalk that creates a public safety issue. That's community caretaking function right there, to tow the car and to inventory it. So that really just doesn't hold water. With respect to the pretext argument, I think this Court has already said this, but absolutely there was no finding of pretext. But even if there had been a pretext under the Supreme Court law, under Wren, which was 1996, and a lot of the case law cited in this case was pre-1996, Wren makes very clear that pretext just doesn't matter as long as there are objective circumstances to justify an officer's actions. And in this case, absolutely there were. The tow policy also doesn't have anything about the sequence of requiring an inventory to occur before the impounding or the towing, as my opposing counsel would contend. You scan the policy. There's nothing in there that says that. And, in fact, Officer Jackson testified, and this is at Excerpt of Record 45, that it's standard to, quote, to inventory a vehicle, quote, prior to towing the vehicle. And that makes sense because you don't want things to get lost between the time it leaves the custody of the police and goes into the custody of the towing company and the time it gets to the impound lot. So that makes sense, and it's not in violation of the policy. With respect to the argument that the policy is unconstitutional, that's been waived. He didn't make the argument in district court. It's meritless because the policy specifically is tailored to the caretaking functions that the police are charged with, with carrying out. It doesn't any of the specific provision under which this particular tow was conducted left the officers with no discretion but to tow the car and to conduct an inventory. And I don't believe that it was raised initially, and I'm not sure about the motion for reconsideration. But it was certainly not litigated, and no testimony, for example, was taken on it. And certainly oral standards can supplement what's written on the face of the statute   And there was no testimony taken from the department, the police department, on how they would interpret or how they understood and whether there are supplemental procedures to the written ones. Thank you, Your Honor. I think you're down to a minute or so. Why don't we give you two? I'm going to be very quick. Why don't we give you two minutes or whatever. Thank you. Say what you need to say. The officers did not ask Mr. Lewis if he had the documents that would have made the temporary registration valid in their mind. They would have been in his wallet, not in the car for the search. The officers could have given the direction to the passenger who had the keys to the vehicle, move the car out of the crosswalk, then will impound it. It would not have been in jeopardy. They could have written the ticket and moved on. The policies require that, and the officers did not follow. They did not arrest Lewis prior to that. Did the officers move the car out of the crosswalk and then impound it? No. That was the second point. I'm going on to the third point, which is the policies, GG09.06, requires, and the officers did not arrest Lewis prior to searching his car, 06-3F2, did not call the tow dispatch center to tow the vehicle, did not request authorization from the supervisory officer to move the vehicle, drove the vehicle away rather than having it towed, did not fill out the tow vehicle form, inventory of tow vehicle form, did not prepare a notice of tow hearing form. The subsequent authorities that were cited by the government, McCarty, Chowdhury, and the new municipal code, 11.1, Chowdhury was decided in 2006. McCarty, which I agree doesn't apply, but nevertheless was decided September 9, 2011. The municipal code section was issued June 30, 2008. The answering brief was filed September 21, 2011. They are not subsequent authorities and should not be considered. But if you look at 11.1, page 9, and you compare it to our excerpts of record, excerpt B, page 14, you will see that we were given and the hearing in this case was with a blank page 9 that talks about a hold and a stop procedure that the policies require. Before you go too far into that, I have a question for you. Where in the record does it say the seat was lifted up? I believe it's through the officer's testimony when they said they went underneath the seat, but I can't give you. But it doesn't say the seat was lifted, does it? I would not say it does. Okay. Okay. And then lastly, Florida v. Wells held that the standardized criteria or established routine in inventory searches must regulate inventory searches, otherwise they would be used as a ruse for a general rummaging in order to discover incriminating evidence. And that's what was done here. Once he did not, once they found out he had a suspended license, they ran to the car, they searched the car, they rummaged the car, not incident to arrest because they couldn't get Arizona v. Gantt criteria met, but instead as a ruse as an inventory search. That's the only basis in the record for the search. Therefore, inevitable discovery does not apply because there's not something that is an independent basis for the search that would have allowed for the inventory to occur. Thank you. Thank you. I'd like to thank both of you for your argument this morning. United States v. Lewis is submitted and we're adjourned for the morning. All rise.
judges: Rothstein, McKeown, Smith